ALEXANDER ELLIS *vs.* LYNN AND BOSTON RAILROAD
COMPANY.

Suffolk.    December 5, 1893. — January 4, 1894.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Personal Injuries — Street Railway — Management of Electric Car — Action —*
*Negligence.*

If a horse attached to a carriage while being driven along a highway becomes
frightened at the noise made by an approaching electric street car, and such
fright is manifest to the motorman, it is his duty to do what he reasonably can
in the management of the car to diminish the fright of the horse, and if, instead
of stopping the car, or ceasing to sound the gong upon it, he continues to pro-
pel the car and to make a loud clangor with the gong, causing the horse to be-
come unmanageable and to throw the driver out of the carriage and injure him,
the driver, if he was in the exercise of due care, may maintain an action for his
injury against the railway corporation.

The rights of the driver of a horse and of the manager of an electric car meeting
upon a highway are equal, and each must use the way with a reasonable regard
for the safety and convenience of the other.

In an action for personal injuries occasioned to the plaintiff by the alleged negli-
gence of the defendant, the judge is not bound to instruct the jury that certain
facts of which there was evidence would or would not constitute negligence
apart from other facts which were testified to.

In an action for personal injuries occasioned to the plaintiff, while driving a horse
attached to a carriage upon a highway, by being thrown from the carriage in
consequence of the horse becoming frightened at the noise made by an approach-
ing electric street car, the jury are rightly instructed to consider the question
whether the motorman of the car ought to have seen the frightened condition
of the horse, if he did not see it, and to treat his failure to see it, when he might
have seen it by the exercise of due care, as negligence.

TORT, for personal injuries occasioned to the plaintiff by the
alleged negligence of the defendant's servants. Trial in the
Superior Court, before *Bishop*, J., who allowed a bill of excep-
tions, in substance as follows.

It was agreed that the defendant was a common carrier of
passengers and operating a street railway; that it had a lawful
location upon Beach Street, in Lynn, and a proper and legal
authority to establish in and upon Beach Street an overhead or
trolley system of electric power, and to operate its cars by that
system ; that Beach Street was a legally located public way ; and
that the telegraph and telephone poles therein were located and
maintained under lawful authority.

The plaintiff testified that, on August 11, 1889, he was riding along Beach Street with his daughter in a top buggy drawn by a single horse; that the carriage and harness were both new and in good repair; that his horse was about eleven years of age, very gentle, well broken and easily controlled; that he had owned it six or seven years, and it had never been frightened before by the cars or otherwise, and had been customarily driven by himself, his wife, and his daughters; that the horse had, at least on two occasions before the date of the accident, seen several electric cars in motion in Brookline and Brighton while the plaintiff was driving it, passing very near to them, and had heard the bell rung and the noise made by the motors of these electric cars; that the horse was not frightened at the cars, and gave him no trouble whatever in passing them, but was perfectly calm in their presence; that on the day of the accident the plaintiff started from his home in Woburn to go to Nahant; that they had travelled about thirteen miles; that the day was warm; that when they arrived at Beach Street, in Lynn, the plaintiff's daughter called his attention to the fact that there was an electric road running through the street upon which they were about to enter; and that he was acquainted in a general way with the width of Beach Street.

On cross-examination, he testified that, after entering the street, and just before the accident, his daughter called his attention to the fact that there were no persons upon the street, and that it was unusually quiet; that he saw no person on the street attempting to cross the same up to the time of the accident; that there was no street crossing Beach Street above or below the place of the accident for about three hundred feet on either side; that after entering upon Beach Street his attention was called to the fact of an approaching car; that he was riding on the right hand side of the street with his reins in both hands; that observing a telegraph pole upon the side of the street about twenty or thirty feet distant, and observing that the street was a little narrow, he slackened the pace of his horse and tried to stop it; and that he was going at a jog, perhaps four miles an hour, when he saw the car.

The plaintiff further testified as follows: "The car approached me. I kept in motion till we got, I should think, some one hun-

dred and fifty feet away.  The car kept in motion.  I kept in motion till I saw my horse arch up its neck a little, and I said, ' I wonder what the matter is,' and I listened and I heard a noise that I had never heard before on an electric car, — more buzzing.  It was a buzzing noise apparently down near the ground under the car, it appeared to me, and also the clanging of the gong.  I wondered what they were beating this gong for.  I was not on the track, but they made a great noise with the gong and a great noise with the motor.  I saw a man I supposed was the motorman.  There was one man on front, and whether there was more than one I could not say.  This man could not help seeing me, because we were right on a line with each other.  The nearer the car came, the noise grew more sharp and acute, until I found that my horse was frightened.  I pulled harder, but it began dancing and springing, and, of course, I expected they would stop the car, but they did not, and I did the best I could until the horse jumped, and finally struck this telegraph post with the shaft.  I should say the car was seventy-five or one hundred feet away from me, I should think that distance. I was in a bad spot.  I should say I was twenty feet away from that pole when the horse became frightened and made the shying.  I don't think they stopped it (the gong) from the time when my horse first took fright, and it rung in my ears as long as I had my senses.  The first spring of the horse broke off my right shaft or whiffletree and crossbar and tug on the right side. I saw the shaft hanging, and I knew by the crash that there must be two pieces of wood broken there, but I had n't any time to make any examination, of course, and braced myself against that to pull, and I held the horse, of course expecting that the car would stop.  I expected relief.  Then the horse pulled me the second time, pulled me from the right seat down on the dasher, struck my abdomen, bent the dasher over, and I found my chin on the whiffletree.  That is the last that I knew."

He also testified that he knew of no occasion for sounding the gong, except his presence there ; that he could not pull the horse off from the pole when it became frightened ; that the bell and the noise of the hissing were very loud ; and that the car did not stop, but kept the noise going, and continued on.

The plaintiff's evidence was corroborated, in substance, by that

of his daughter, who also testified that, when the shaft of the carriage struck the telegraph pole and was crushed, the plaintiff was pulled violently from his seat on to the dasher; and that he regained his seat, and was pulled off again.

Mrs. Tufts, a witness for the plaintiff, testified that she was sitting at a front window in her house on Beach Street, where she had lived for five years, on the line of the electric road, about three hundred feet from the place of the accident; that at the time of the accident she heard a loud clanging of the gong on the car, and the buzzing of the motor; that it was an unusual noise and drew her attention; that in consequence she spoke to a third person, who immediately ascertained that an accident had happened; and that this noise continued several seconds.

Charles E. Welch and John R. Fay, called as witnesses for the defendant, testified that they were returning from the beach, and had not quite reached the telegraph pole when the plaintiff's carriage collided with it; that they did not notice any ringing of the bell on the electric car; that they saw the plaintiff's horse approaching, and it came along at a slow trot until within twenty feet of the telegraph pole, and from eight to twelve feet of the car, when it suddenly made a shy to the left towards the car, which was apparently checked by the plaintiff; that it then made a violent shy to the right, and collided with the pole while the car was passing; and that the shy to the left, when about ten feet from the car, was the first indication of fright on the part of the horse that either of them saw.

The motorman of the car testified that he rang the bell only three times, and not after he was within fifty feet of the plaintiff's horse; that up to the time that the horse passed beyond his observation, without turning, he saw no signs of fright; that he was standing on the front platform, with one hand upon the controlling lever, and the other hand upon the brake of the car; that there were a lot of children in the street, that this was a very bad place for children; that they used to come out and run back and forth from one side to the other, to see how many times they could go across before the car reached them; and that there were children there on this occasion.

The conductor testified that he was collecting fares on the running board of the car, which was an open car, on the opposite side

from the horse and carriage; that he had passengers standing between the seats; and that he did not see the horse and carriage until after the car stopped, some fifty feet beyond the carriage.

The defendant also introduced evidence, which was uncontradicted, that the defendant's rules forbade reversing the power at all; that the car in question began running on Beach Street, from Central Square, Lynn, to the beach, about five weeks prior to the accident; that it was a new car, and the only car then running, or that had ever run, on that line; that the motor was a new Thomson-Houston motor, manufactured in Lynn, the only kind of a motor then in use in Lynn, and the only kind up to that time and for some time thereafter manufactured by the Thomson-Houston Company; that the only motors prior to and at that time in use in Brookline and Brighton were either the Sprague or Bentley-Knight motors, which made less noise in running than the Thomson-Houston motors, owing to a different arrangement of the machinery, and which were subsequently replaced on those lines by Thomson-Houston motors; and that the bell used on the car was a gong under the front platform, and was rung by the motorman pressing the lever, which came up through the platform, with his foot.

The defendant called an expert electrician from the Thomson-Houston Company's works, who testified that the bell always made about the same sound when rung, no matter what the pressure upon it was; that by reversing the power and putting on the brake a car could be stopped in a distance of from six to eight feet; that reversing the power would be likely to throw all the passengers violently forward, and ruin the motor; that it was a practice that was only resorted to in order to prevent serious accident; and that the buzzing noise of the motor would be diminished as the speed of the motor diminished, and would stop if the power was taken off, leaving only the sound of the articulating machinery and the rumbling of the car.

The point on Beach Street where the accident occurred was about one fifth of a mile from Central Square, in Lynn. A section of the street, one hundred feet long, extending about fifty feet in each direction from the pole with which the plaintiff collided, has four dwelling-houses on each side of the street, and the street curves somewhat at this point. No contention was

made that the speed of the car, four or five miles an hour, was excessive or improper.

The defendant asked the judge to instruct the jury as follows :

" 1. Under all the evidence in this case, the verdict must be for the defendant.

" 2. The fact that the motorman kept his car in motion at moderate speed when there was no collision, and no likelihood of any collision, is not sufficient to make the defendant liable.

" 3. Although the jury believes that the motorman saw the horse, and could have stopped his car before it passed the horse, he was under no legal duty to so do, except to prevent collision. If there was no collision, his failure to stop was not negligence.

" 4. The whizzing noises connected with the running of the car, in the absence of any proof that the machinery was not such as was generally used at that time, or defective, is not sufficient to make the defendant liable.

" 5. It is certainly not true in law that street car companies are responsible for horses taking fright at the movement of their cars. They have just as much right to run cars on the streets of the city as other citizens have to drive through the streets with their horses and carriages.

" 6. The motorman of an electric car is not bound to look on both sides of the street while propelling his car, but is sufficiently performing his duty if he watches his track before the car, and sufficient space on each side of the rails, to be sure that he can propel the car at the rate of speed in which it is going without running over anybody or into any vehicle.

" 7. By being empowered to run its cars over Beach Street, and to use the electric system of motive power in running its cars on said street, the defendant has necessarily the right to make the reasonable and usual noises incident thereto, whether occasioned by the peculiar whirring sound of the electric motors, or by the rattling of the cars over the rails, or by the sounding of the gong employed to warn the public of the approach of the cars ; although such noises may cause much annoyance and danger to those who are driving horses in the immediate vicinity, they must be prepared for them.

" 8. The defendant's servants, operating one of its cars in a manner authorized by law, are under no obligation to stop such

car upon seeing a horse on the side of the street, with room enough between it and the track for the car to pass without collision, merely because the horse shows some signs of fright, its driver apparently being awake to the condition of the horse, and having it under control.   Nor is it such negligence as to make the defendant liable for the servants in charge of the car to sound the gong as a warning to the public, and to foot passengers on the street, of its approach.

" 9. Being authorized by the proper authorities to propel its cars where and by the means it did, the defendant had an equal right to the use of the streets with its cars that the plaintiff had with his horse, and this right involved the propulsion of the car at a reasonable rate of speed, and the right to sound its gong for the purpose of warning the plaintiff and others of the approach of the car, and the defendant's servants in charge of the car were under no obligation to bring the same to a standstill because of the fright of a horse on the street, unless the failure so to do was such as to make a reasonable person anticipate a collision between the car and the horse and carriage.

" 10. It is the duty of the motorman in charge of the electric street car, as it is of a gripman in charge of a cable car, to sound his bell at frequent intervals while propelling his car along the street.   This duty becomes imperative when going around curves, approaching curves, or passing along streets in cities in localities where many children use the street as a playground, and under such circumstances the duty of sounding the bell is paramount to that of not sounding it, even though it becomes apparent that this, with the other noises incident to the operation of the car, are contributing to the fright of a horse upon the street.

" 11. If the jury believe the plaintiff's statement that, when he ran into the post, the car was one hundred feet away, the plaintiff cannot recover damages for any injury resulting from so running into the post.   It was not the duty of the defendant's agent to abstain from ringing the bell, or to stop his car, because of the fright of a horse one hundred feet away, even if such fright was apparent to the motorman."

The judge declined to give these instructions, and instructed the jury, in substance, as follows :

" By being empowered to run its cars over the street in ques-

tion, and to use the electric system of motive power, the defendant has necessarily the right to make whatever noises are reasonably incident to running its cars over that street, whether those noises are occasioned by the electric motor or by the gong used to warn the public of the approach of a car. . . . The defendant has a right to operate its road in a lawful manner by means of the overhead electric system, and when it does this without negligence it is not responsible for injuries occasioned thereby. The claim is. for damages for an improper exercise of the right to run the cars, for doing that which was outside of what was necessary and proper. This corporation having a right to run its cars through this street and to use an overhead electric system, there were two parties under these circumstances who had a right to the use of the street, the defendant and the plaintiff, and each had a right in the street, . . . and upon each the obligation was laid so to conduct themselves, so to use their property, as not to injure the person or the property of the other, so far as that could be done through the exercise on the part of each of reasonable care. . . .

" First, in regard to the due care which the plaintiff was bound to exercise. He was bound to conduct himself on that occasion like a prudent man. . . . Whatever due care should have led him to do, that he was bound to do; and when you test the question of what was due care on his part, you have a right to put yourselves in his place, and ask, What would any one of us have done, being a reasonable man, acting from motives of reasonable prudence and care, as men of usual care ordinarily act? . . . If you took this road, you will consider whether as prudent men you would have stopped before the plaintiff did; whether you would have stopped before you came so near the telegraph pole as the plaintiff came, as the defendant contends he ought to have done, and have left a clear space of some distance beyond you, so that if the horse became frightened there would not be a telegraph pole so immediately near as this one was. . . . If you find that he was negligent in this respect, he cannot recover; but if you find that he was in the exercise of due care, you will proceed to the second question, which is whether there was negligence on the part of the employees of the railway company.

" You will observe that the claim on the part of the plaintiff

is, that they kept on ringing the bell and with the movement of the car in the face of apprehended danger when they saw or might have seen manifestations of fright on the part of the horse. You will take all the evidence on this subject into account. You will carefully weigh the evidence, the plaintiff's testimony, the testimony of his daughter, and perhaps some other testimony in the case tends to establish that proposition, that the horse being frightened, the plaintiff got control of him, and that then the car kept on and the noise kept on until the horse took a second start, the plaintiff lost control of him, and the accident occurred. The motorman and the conductor of the car deny that they saw any manifestations of fright then in the horse. . . .

" I apprehend that this point, the question whether they . . . either did see or ought to have seen the frightened condition of the horse, is a point which it is important in this case for you to determine, because the claim on the part of the plaintiff is not that this company was negligent in the car going along there, making an outrageous noise and proceeding rapidly ; . . . that is not it, but it is that under these circumstances it was negligence ; to wit, circumstances of danger attaching itself to the man whom they were meeting ; so that whether they saw, or, what I think is the same thing, whether they ought to have seen, manifestations of fright on the part of the horse is, I think, a vital question in this case.

" In order that these points in the case, which I think are the points upon which the case sharply turns, may be exactly defined and brought out in the matter, I will submit to you three questions which I desire you to answer. The first will be, Was the plaintiff in the exercise of due care ? . . . The second is, Did the motorman or the conductor of the car see any manifestations of fright on the part of the horse before the accident, or might they by the exercise of due care have seen such manifestations ? . . . Third, Were the motorman or conductor guilty of negligence in sounding the bell, or in not stopping the car after they saw, or might by the exercise of reasonable care have seen, the manifestations of fright on the part of the horse ? "

The jury answered each question submitted to them in the affirmative, and found for the plaintiff ; and the defendant alleged exceptions.

*T. P. Proctor & B. W. Warren*, for the defendant.

*A. A. Strout*, (*J. W. Johnson* with him,) for the plaintiff.

KNOWLTON, J. Although there was some conflict of evidence in this case, the jury may have found that the plaintiff, having no reason to think it unsafe to do so, drove down a street in the city of Lynn on which was an electric railway and there met one of the defendant's open electric cars filled with passengers, on which the motorman was continually sounding the gong; that his horse was frightened at the car and at the noise of the motor and of the gong, and manifested its fear in such a way as to show the motorman that the plaintiff and his daughter who was riding with him were in great peril, and that the motorman, instead of stopping the car, or ceasing to sound the gong, kept on with the car and continued to make a loud clangor with the gong, so that the horse became unmanageable, broke the carriage, threw the plaintiff out, and thereby inflicted serious injuries upon him.

The defendant's requests for rulings go upon the theory that the manager of an electric railway car upon a street is never called upon to stop the car or to change his method of managing it to avoid any danger from the fright of horses other than the danger of collision with the car. These requests were founded on an erroneous view of the law. It is a well known fact that most horses are frightened at their first view of a moving electric car, especially if they encounter it in a quiet place away from the distracting noises of a busy city street. It is only by careful training, and a frequent repetition of the experience, that they acquire courage to meet and pass such a car on a narrow street without excitement. The rights of the driver of a horse and the manager of an electric car under such circumstances are equal. Each may use the street, and each must use it with a reasonable regard for the safety and convenience of the other. The motorman is supposed to know that his car is likely to frighten horses that are unaccustomed to the sight of such vehicles, while most horses are easily taught after a time to pass it without fear. It is his duty, if he sees a horse in the street before him that is greatly frightened at the car, so as to endanger his driver or other persons in the street, to do what he reasonably can in the management of his car to diminish the fright of the horse, and it is also his duty in running the car to look out and see whether,

by frightening horses or otherwise, he is putting in peril other persons lawfully using the street on foot or with teams. In this way the convenience and safety of everybody can be promoted without serious detriment to anybody. Of course the owners and drivers of horses are required at the same time to use care in proportion to the danger to which they are exposed. *Benjamin v. Holyoke Street Railway, ante,* 3.

These principles were adopted by the presiding justice for the guidance of the jury at the trial of this case, and the instructions given were correct. So far as the defendant's requests for instructions embody correct propositions of law, they were covered by the instructions given. The judge was not bound to tell the jury that certain facts of which there was evidence would or would not constitute negligence apart from other facts which were testified to.

The jury were rightly instructed to consider the question whether the motorman ought to have seen the frightened condition of the horse if he did not see it, and to treat his failure to see it when he might have seen it by the exercise of due care as negligence. There was ample evidence to warrant the verdict, and the bill of exceptions discloses no error in the proceedings.

*Exceptions overruled.*